PERSONS vs. PERSONS.

1. The fact that part of the purchase money of land bought by and conveyed to a husband, was the earnings of the wife during coverture, gives her no claim against him or against the proceeds of sale of the property.

2. Whether a purchase in the name of a wife is a settlement or not, is a question of pure intention, though presumed in the first instance to be a provision and settlement; but any antecedent or cotemporaneous acts or facts may be received, either to rebut or support the presumption.

2. Where a wife takes title to real estate in her own name, but purchases it with the money and as the agent of her husband, in the absence of any proof of settlement of the property upon her, there is a resulting trust in the husband's favor.

On final hearing on pleadings and proofs.

*Mr. S. Tuttle*, for complainant.

*Mr. A. B. Woodruff*, for defendant.

THE CHANCELLOR.

The bill in this cause is filed by James Persons against Harriet Persons, his wife, to compel a conveyance by her to him of two houses and lots of land in Paterson, which were conveyed to her by Jane Rogers and others, on the 1st of June, 1866, for the consideration, as expressed in the deed, of $3500. At the time of the conveyance, there was only one house on the property. This was afterwards raised and repaired, and the other house built. Of the consideration, $1000 were paid in cash on the delivery of the deed, and the rest, $2500, was secured by the bond and mortgage of the complainant and defendant, (both of them having executed the bond as well as the mortgage,) payable on the 1st of December, 1866, with interest at seven per cent. per annum. Of the principal of this bond and mortgage, $2150 were paid on the 3d of December, 1866; on the 11th of February, 1868, $200 were

paid on account of the balance of principal; on the 23d of May, 1869, $100 on the same account; and the residue, $50, was paid on the 8th of March, 1870. The bill states that the parties were married on the 14th of June, 1842, and that they lived together from that date up to October 26th, 1872, when the complainant was expelled by his wife from the house they then occupied, being one of the two houses above mentioned: that at the time of, and previously to the conveyance of the property in question by the deed above referred to, he was possessed of a considerable sum of money in his own exclusive right, amounting to about $5000, which he had accumulated during a long period of time, as a steward in the employment of an officer in the East India Company in Asia, before his marriage to the defendant, and partly from the profits of a farm which he, since then, owned and worked at Mead's Basin, in the county of Passaic; that for some time prior to the purchase of the property in question, he had been urged and solicited by the defendant and others, to buy it, and that being then very ill and infirm and unable to go about or to attend to his own business, and being then well advanced in years, of the age of seventy-eight years, he yielded to these requests and solicitations, and consented to make the purchase for the sum of $3500; that confiding in the good intentions, honesty and integrity of his wife, who was much younger than he, and about forty-six years old, he entrusted to her the purchase of the property and obtaining the deed and paying the consideration money, and that for that purpose, he furnished her with $3500. The bill further states that she proceeded with the negotiations for the purchase, and on the 1st of June, 1866, secretly and without his knowledge, procured the deed to be made to her in fee simple; that she paid for the property entirely with, as he believes, the money which he furnished her for the purpose, and which belonged to him, and with which he entrusted her to pay for it for him and to take the title in his name, but that she, taking advantage of his infirm and helpless condition, procured the property to be conveyed to her, as in her own

right, in order to cheat and defraud him out of his money and property, and to secure to herself and her heirs, the whole of the property, with the right of present and future control over it. It further states that at the time of the purchase, she had no money or property of her own; that ever since their marriage, she had been entirely supported by him; that shortly after the purchase of the property, he moved with her into one of the houses and lived with her there until, as above mentioned, she expelled him therefrom, forcibly ejecting him from the premises and refusing to allow him to come into the house or to live with her, and refusing to care for him in any way, in his old age and infirmity; and that she then for the first time claimed that the property belonged to her exclusively, and that he had no control over it. The bill alleges that he then first learned that the deed for the premises had been made to her as grantee, and not to him, and that since that time he has been compelled to seek a home elsewhere, and dares not return to the house for fear of his wife and of certain other persons living there with her, and aiding and abetting her in her efforts to keep him out of the use and enjoyment of the property and to break up his home; that the household furniture in the house belongs to him, but that she retains possession of it and excludes him from the use of it; that he has no means of support, except from the houses and the income of certain money amounting to about $30,000, which he from time to time has placed in her hands to take care of for him and for which she refuses to account, and that he is, by reason of his age and physical infirmity, unable to perform any manual labor or to do anything towards his own support; that of the two houses on the premises, the defendant occupies one and rents the other at about $450 a year, and that she takes the rent to her own use, and refuses to pay it, or any part of it, to him. The bill alleges that he has requested her to join him in conveying the property to some third person, that it may be conveyed to him, and to pay him the rents and to abstain from further collection

thereof, and that she absolutely refuses to comply with such request.

The answer admits the marriage and that the complainant and defendant lived together as stated in the bill, but denies that he ceased to live with her for the reasons, or any of them, stated in the bill. It denies the statements of the bill as to the possession by the complainant, previously to the 1st of June, 1866, of a considerable sum of money in his own right, and that he had accumulated any considerable sum of money, and that he, after their marriage, had ever earned any considerable sum. It denies also, that the defendant ever urged and solicited him to buy the property in question, but claims that she bought it of her own accord, and as her own, in her own right, and with her own money, and with his consent. It admits that when the purchase took place he was old and infirm, but denies that he was so feeble as to be unable to go about and attend to his business. It denies that she received any money from him with which to pay for the property, or that the title was to be taken in his name, but claims that the project of buying it was all her own, and that she in no wise acted therein for him, and that the title was, without concealment, taken by her in her own name. It denies that she had no money of her own, but avers that many years before she came to this country she kept a laundry and made a considerable amount of money, and that since she came here she has always worked hard, both as a laundress and keeper of a boarding-house, and in that way and by her own industry had earned enough prior to the purchase, not only to support herself and to contribute the greatest part of what was necessary to and was taken for the support of the complainant, but to accumulate the $1000 she paid on the delivery of the deed, and all she has since paid on the property. It denies his statements as to expulsion from the house, and alleges her willingness to take care of him; claims that she owns the household furniture, and alleges that all the property the complainant has, or which she knows of his having, is $400, which she says he lent on

mortgage, to one Deborah McKee, and denies his statement as to his having placed in the defendant's hands $30,000. It admits that there are two houses on the property, in one of which she lives, and that she rents the other, which she says she built in 1872, with her own money, to various tenants, and claims a right to do so, for her own use; and it admits also that she refuses to convey the property to the complainant, or for his use, or to account to him for the rents, or to refrain from collecting them. The answer alleges that the complainant and defendant were married in England; that soon after the marriage took place they left that country and went to Van Diemen's Land; that there the defendant learned that the complainant had been married to another woman before his marriage to her, whom he then said he had left in Nauvoo among the Mormons; that she learned there that the complainant had been a convict in England, and had been transported for crime; that in consequence of these facts, she, being unable to learn whether his former wife was alive or not when the defendant was married to the complainant, and on account of the complainant's indecent language and vulgar conduct, she is unwilling longer to cohabit with him, but is willing to provide him with a room and to care for him; that since his marriage he has not earned enough to pay for his board and clothes; that when he and she were in Van Diemen's Land and in South Australia she earned by her laundry all the money they lived on there, and saved enough from her earnings to send £300 sterling to her parents, in England, and that it was a part of this money which she afterwards got and the complainant took to buy the farm at Mead's Basin, but that when the complainant took title for that property, he took it in his own name instead of hers, as he ought to have done. The answer further states that the complainant joined in the mortgage given for part of purchase money of the property in question in this suit, and knew from the statements therein, and was apprised by the officer who took his acknowledgment, that the title was taken by her; that in May,

1872, he joined her in a mortgage on the property to the Paterson Savings Institution to secure the payment of $1700, in which the property was described as having been conveyed to her, and in April of the same year he joined her in a mortgage to Alexander W. Rogers for $300, on the property; and that on the 5th of November of the same year, she, needing more money to pay for the house she had built on the property, borrowed $1400 of Isaiah Farthing, for which she gave him a mortgage on the premises in her own name, in which the complainant refused to join.

The first question I shall consider is, who purchased the property in question in this suit, the complainant or the defendant? That the former bought it, appears clear. He testifies that he was persuaded by his wife and others, among whom was Mrs. Alice Dobson, to purchase it; that he was not disposed to do so, but that, yielding to their solicitations, he concluded to buy it, and, to that end, had an interview with Dr. Rogers, who was one of the owners of the property, and agent for the sale of it. He circumstantially narrates that transaction; says Dr. Rogers insisted on $4000 as the price; that he refused to give more than $3500, which was then and there accepted, and that $50 were paid by the defendant, at his direction, to bind the bargain. Mrs. Dobson corroborates the complainant, both as to the purchase by him, and as to the fact that both the defendant and the witness urged the complainant to buy the property, and also to the physical condition of the complainant at the time; all of which, the purchase of the complainant, the solicitation of the defendant and others, that he should buy the property, and the illness of the complainant at that time, are expressly and explicitly denied by the answer. The complainant's account of the transaction is this: "I was at William Dobson's, in Prospect street; I was very ill; my wife came there, and Mrs. Dobson and my wife took me by the arm and led me down to back of the Association; Dr. Rogers stood there; his horse was tied to a post; we all four stood together; I asked Dr. Rogers what he wanted for that property on River

street; he told me he wanted $4000 for it; I said, Doctor, take five hundred off, and then I can talk to you; he said it was his mother's and sister's property, and he could not do anything more; I told him I had no more to say about it then; I asked my wife and Mrs. Dobson to lead me back again; the Doctor said, when I was going to turn away from him, that I should have it; I told him then, to get it surveyed; there was about six feet of ground that he called his own property, up in the front, but it came out to nothing about half way down the lot; he wanted $100 for that, as my wife told me; she had been down to him before that, as it appeared; I told him I would not give it—I would give him fifty; I told him to get it surveyed, and then I told my wife to give him $50 to bind the bargain; then I left him, and they took me up to Dobson's house again; before I purchased it, she wanted me to buy it; Mrs. Alice Dobson and Mr. William Dobson, her husband, persuaded me to buy it, and said it was a good property, and cheap; I told them I did not like the situation where it was; I did not like the property." Mrs. Dobson testifies as follows : " I went with Mr. and Mrs. Persons down into Broadway, and they were going up to see Dr. Rogers, and she saw Dr. Rogers coming in the carriage; we stood somewheres by where McGrogan's fish market used to be at the time, in Broadway, and they both tried to make signs to Dr. Rogers to stop the wagon, but he did not stop till he got by the Association, and then Mrs. Persons went across; I stood by Dr. Whiteley's office, and Mr. Persons went across, and they talked perhaps a quarter of an hour—it seemed to me to be a great while—and then when they came back, Mr. Persons said that he had told him to come down $500, and he would talk to him; he said he had given him $50—I can't say positively—to bind the bargain, and he said he must have it surveyed." She says the complainant " was very poorly at the time, very poorly; he was very feeble, couldn't get about at all, scarcely; had to keep his bed the biggest part of the time." He was then staying at the witness' house. The defendant was up at

Mead's Basin, nursing an invalid lady. When asked as to why the complainant purchased the property, she answered : " Mrs. Persons wished to live there ; Mr. Persons did not care to live there, but he bought it, I believe." On the subject of solicitation to purchase, she testifies that she told him it was good property, and if she were he, she would buy it, and if he did not, she would, if she had the means. She says he was opposed to buying the property, and that Mrs. Persons said a good deal to him in favor of buying it, and urged him to purchase it. Dr. Rogers testifies that he does not know that he met these parties (the complainant and defendant) at any time before meeting them one day in the street ; that he was in his carriage, riding through Broadway, near the Association's mills, opposite the engine house, when he was stopped by Mr. and Mrs. Persons ; that they were together, and that they referred to the information which he had already received of their desire to purchase. He adds that the terms there were finally agreed upon. There seems to be no room for doubt, that the agreement for the purchase of the property was made by the complainant, notwithstanding the defendant's denial contained in her answer.

The next question is, with whose money was the property paid for ? The complainant says it was with his. The defendant, in her answer, (she was not sworn as a witness,) says it was with hers. She says in her answer, that " she denies that at the time of her purchase of said property she had no money of her own, and she avers that many years before she came to this country, she kept a laundry and made considerable money, and that since she came to this country, she has at all times worked very hard, both as a laundress and as the keeper of a boarding-house, and in this manner and by her own industry she had earned enough, previous to said purchase, not only to support herself and contribute the greatest portion of what was necessary to, and was taken for the support of the complainant, but to accumulate the $1000 she paid at the time of said purchase, and all that she has paid on the same since said purchase." In another part of the answer

she says, that while the complainant and she were in Van Diemen's Land, and in Adelaide, in South Australia, to which they afterwards went, she earned by her laundry nearly all the money that they lived on, and saved enough from her earnings to send £300 sterling to her parents, in England, to keep for her, and that it was a part of this money that she afterwards got and the complainant took to buy the farm at Mead's Basin. She does not say where she had been accustomed to keep this money, with which she alleges she paid for the property in question in this suit, or how it was invested, or where it was when the property was purchased. Some of it she claims to have brought with her when she came to this country, which was in 1853. From the above statements of the answer, the inference is that the money with which she paid for the property in suit was not derived from the sale of the farm. She does not allege in the answer that the money with which she paid for the property, came from the farm, nor yet does she deny, except inferentially, as above suggested, that it was derived from that source. She denies that her husband had any considerable sum of money derived from the sale of the farm, or any other source, while it appears that he sold the farm for $2200, and his stock and other personal property there for $1800 or $1900. She sets up no claim to this money, nor any part of it, except that she says, that part of the £300 above referred to, the complainant took to buy the farm. The fair inference from the answer is, that it was not the money derived from the sale of the farm and stock and other personal property there, with which the property in Paterson was paid for. That it was paid for with that money, however, seems very clear. She took that money into her possession when the farm and personal property were sold. Dr. Rogers testifies that he understood from the complainant and defendant, that the purchase money was to come, at least a great part of it, from the property which they held and occupied at Mead's Basin, but in whose name that property was held, he did not know; he understood, he says, it was held jointly. Robert Bridge, one

of the defendant's witnesses, testifies that he understood from her, that the money obtained from the sale of the farm went towards paying for the property in question in this suit. The complainant testifies that the money with which the property in suit was paid for, was his money, derived from the sale of the farm and stock and the personal property ; that the mortgage for part of the purchase money was made for six months, to become due when the purchase money of the farm should be paid. The mortgage was, in fact, made payable at six months from its date, and it appears by an endorsement on the bond, that on the 3d of December, 1866, at the end of the six months, $2150 of the principal of the mortgage, ($2500,) and $87.50 interest were paid. If the defendant be regarded as denying, by her answer, that the money with which the Paterson property was paid for, came from the sale of the farm and stock and other personal property of the complainant, the evidence disproves her answer. If, on the other hand, she be regarded as admitting that the money came from that source, she cannot be considered to have furnished the money for the Paterson property. Again, if, as she claims, her husband took part of her money, the £300 above referred to, to pay for the farm, that would give her no claim to the proceeds of the sale of the farm. How much of her money he took, she does not say. At most, according to the answer, it was only part of the £300. He, however, swears that it was his own money, and not hers, with which he paid for that property. But if, indeed, part of the money with which the farm was paid for, was earned by her, as she says, by her labor during her coverture, she has no claim either against him, or against the property or proceeds thereof, for or in respect of it. She and her husband lived together from the time of their marriage up to October 26th, 1872. *Skillman* v. *Skillman*, 2 *Beas.* 403 ; *Belford* v. *Crane*, 1 *C. E. Green* 265 ; *Cramer* v. *Reford*, 2 *C. E. Green* 367 ; *Annin* v. *Annin*, 9 *C. E. Green* 184.

The remaining question is, whether, although the land was purchased by the complainant, and the purchase money paid

by him, the defendant is not still to be regarded as the absolute owner of the property. Whether a purchase in the name of a wife, is a settlement or not, is a question of pure intention, though presumed in the first instance to be a provision and settlement, but any antecedent or contemporaneous acts or facts may be received, either to rebut or support the presumption. *Perry on Trusts,* §§ 147, 148 ; *Peer* v. *Peer,* 3 *Stockt.* 432; *Devoy* v. *Devoy,* 3 *Jur. N. S.* 79; *Stone* v. *Stone, Id.* 708 ; *Sidmouth* v. *Sidmouth,* 2 *Beav.* 447; *Christy* v. *Courtenay,* 13 *Beav.* 96; *Williams* v. *Williams,* 32 *Beav.* 370. The answer, it may be observed, does not put the defendant's case upon the ground of settlement, or of conveyance to the defendant by direction of the complainant. It says indeed, that the conveyance of the property was made to the defendant with the knowledge and consent of the complainant, but it wholly repudiates all agency or instrumentality on the part of the complainant in the transaction. It denies that he had any participation therein, except to execute, with his wife, the mortgage given for part of the purchase money. The complainant swears that he was not aware, until the time when his wife ejected him from the house, that she had taken the title to the property. It is urged on the other hand, that he must have known the fact at the time the conveyance was made to her, because the officer by whom his acknowledgment to the purchase money mortgage was taken, made known to him the contents thereof, and besides, he must have known from the subsequent mortgages executed by him with his wife, that she held the title to the property. I do not attach much weight to these considerations. The complainant is evidently an ignorant man. He is admittedly a very old one. At the time of executing the purchase money mortgage he was seventy-eight years of age, and when the others were executed he was eighty-four. Nor is there, in view of their character and the circumstances under which they were made, any more importance to be attached to the expressions testified to by James Van Emburgh as having been made by the complainant, recognizing the de—

fendant's ownership of the Paterson property. It appears that he had, by his will, given the property to his wife. She was, when the expressions were made, exercising just such dominion over it as was for their joint interest, and as was to be expected from the difference in their ages—he being very aged and infirm, and she in full vigor and of middle age.

The expressions testified to by Bridge and Hampshire to the same effect, appear to me to be of but little consequence. The evidence as to presumable knowledge on the part of the complainant, that the conveyance of the Paterson property was made to his wife, is by no means cogent, and it does not appear that he gave any directions that it should be so made. The recollection of the scrivener by whom the deed was drawn, is not clear on that point. It appears that he received his instructions to draw the deed from Dr. Rogers, who was one of the grantors. Dr. Rogers testifies on this head, that he has no recollection that the complainant told him to have the conveyance made to the defendant, and in answer to the question, " Do you know how the deed came to be made out to Harriet Persons ? " he says : " I have an impression that something was said at that time about the feebleness of Mr. Persons' health, and the great uncertainty of his living long, and that the property at his death would go to Mrs. Persons ; that it would save trouble to have the deed made in her name. These are my impressions." From whose conversation these impressions were derived he does not state, but it is by no means improbable that it was from that of the defendant. And if they arose from that of the complainant, they prove no intention of settling the property on the defendant to the exclusion of the complainant, but only to secure the property to the defendant after his death. But the defendant makes no allegation that the conveyance was made to her through any intention on the part of the complainant to give or secure the property to her. She claims the property as her own by reason of her own alleged purchase of it for herself, with her own separate estate, and for her own use.

The evidence shows, however, that it was in fact purchased by the complainant, and paid for with his money, and that the defendant, who acted in the matter as agent for him, holding and disbursing his money for it, took title for it in her own name. There is no pretence of any settlement of the property upon her. The conclusion follows, that there is a resulting trust in his favor. That his farm was sold for $2200, in cash ; that his stock and other personal property there brought $1800 or $1900, cash ; that this money, in all about $4000, went into the hands of the defendant as his agent, there seems to be no question. His brother and he both swear, that from 1853 he received from abroad, $4300. The defendant has not seen fit to give her testimony in the cause, and has offered no denial of the complainant's statement, that the entire proceeds of the sale of his farm and stock and other personal property there went into her hands, and that she put it into the First National Bank of Paterson ; nor has she shown what became of this money thus entrusted to her. She relies on proof of admissions made by the complainant, that she earned a considerable amount of money by her labor, but as before remarked, this was money to which he was, by law, entitled. The only money which she attempts to prove specifically as her separate estate is that which Robert Bridge, one of her witnesses, claims to have borrowed. This, however, was only $500 in all, and it appears to have been, in fact, lent by the complainant ; and, besides, it was, according to this witness' statement, money to which the complainant was, by law, entitled. Bridge testifies that she loaned him some money eight or nine years before the time when he testified in this suit, and that it was twelve months before the sale of the farm. But to the question, " Did you ever hear Mr. Persons say whether his wife Harriet had earned any money of her own, if so, what did he say on the subject ?" he answered : " I have heard him say she had money ; I borrowed some of him, not of him ; I would like to tell you how it came ; the money that I borrowed was actually from her—she give it to me."

He says he got this money from her hands, in the First National Bank in Paterson; he believes there were two sums—$300 and $200. It seems to me that it could not have been difficult for her to have shown that she had money on deposit at that time in her own name, in the bank referred to, if such was the case. She has not done so. I am inclined to think that the loan, if it was made, was, as the witness' testimony, in his answer above given, indicates, really by the complainant, but that the witness received the money from the hands of the defendant, and it seems very probable that Bridge is mistaken as to the time—that it was after, and not before, the sale of the farm. After first saying that the complainant or defendant did not say how the latter got this money which he so borrowed, or how it became the property of the defendant, he afterwards testifies that the complainant did say that the defendant got the money by keeping boarders at the farm, and managing that property, the complainant being too feeble for anything. It appears by the testimony of this witness, that after the conveyance of the Paterson property to the defendant, he went with her to New York, to draw from a bank there £40, which the complainant had there on deposit, and that they failed, because the signature purporting to be that of the complainant on the draft or order, was pronounced not to be genuine. From this it would seem that the statement made by Richard Hampshire, one of the defendant's witnesses, as to the penniless condition of the complainant while the latter was living on the Paterson property, and the witness was boarding there, is not worthy of credit. He says the complainant said he had nothing; that his wife had all; and the witness says the complainant would borrow a penny from him to buy tobacco, and for a contribution in church, because he did not like to ask his wife for it. According to Bridge, the complainant had, at that time, £40 on deposit in New York. The answer, besides, says, that the complainant has £90 which he loaned on mortgage, to Mrs. Deborah McKee. Mrs. McKee, however, was called for the defendant as a witness, and contra-

dicted the answer, by swearing that she did not borrow that money of, or owe it to, the complainant, but to the defendant, and that she received this money, which the defendant swears belonged to the complainant, from the defendant.

The defendant drove the complainant out of his house at night, there is reason to believe, with violence, giving him a dollar with which to provide himself with lodging at a tavern, and forbidding him to return. Since then he has been dependent upon charity for his subsistence. Her reason for her unwillingness to live with him, that she is doubtful whether, when he married her, he had not a wife living, is manifestly disingenuous, for she cohabited with him twenty years after she ascertained the fact of his former marriage, and she does not profess to have any new light or information on the subject; and her other reason, his alleged improper language and habits, is not sustained by any proof, but from the evidence in the cause appears to be unfounded. That the defendant has not been scrupulous in dealing with the complainant's rights, may be inferred from the fact that, when, in February, 1872, she made a will, she signed his name to it as if he had executed it with her, evidently for the purpose of validating it, though she does not even pretend to any authority for so doing. I see nothing in the defence set up in the answer, or in the evidence adduced on behalf of the defendant, to constrain me to withhold the decree of this court to restore to the complainant his property. The apparent exaggerations in his testimony, as to the amount of his property gained in Australia, and the improbable allegation in his bill as to the amount of money which he gave into the hands of his wife while they lived on the farm, may, without any great stretch of charity, be attributed to his extreme old age. They cannot affect those facts in the case which are clearly proved, and the conclusions which, on established principles of equity, result from them. I forbear to speak of the unsupported, and apparently utterly unfounded charge in the answer, that the complainant was a transported convict,

dismissing this with the other scandals in the cause, as foreign to the issue between the parties.

There will be a decree for the complainant, in accordance with the views I have expressed.